UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MICHAEL D. RATLIFF,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 5:14-CV-00153** |
| | ) | |
| **ADVISORS ASSET MANAGEMENT,** | ) | |
| **INC.,** | ) | |
| **Defendant** | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the court are defendant Advisor Asset Management's Inc.'s ("AAM") motion for summary judgment, ECF No. 19, and motion to strike summary judgment evidence, ECF No. 24. After due consideration of the pleadings, the applicable law, and the record before the Court, AAM's motion for summary judgment shall be **GRANTED** and AAM's motion to strike summary judgment evidence shall be **DENIED** as moot.

### I. BACKGROUND

Plaintiff, Michael D. Ratliff ("Ratliff"), is a former employee of AAM. Ratliff is an African American. He began working at AAM in March 2003, and was fired in September 2013. During his time at AAM, Ratliff worked his way up from the position of bond salesman to the position of vice president of investments and from 2007 through 2009 held a management position.

Ratliff worked as a bond salesman assigned to AAM's national account division. His employment involved the facilitation of bond trading, as well as the trading of other investment vehicles for outside registered representatives. It appears each salesperson on AAM's teams was

assigned or acquired the right to work with certain outside representatives who had contracts with AAM and would receive a commission based on a predetermined percentage of the total dollar value of each trade. That commission is known as the "broker sales commission" ("BSC"), and it was this number from which each month's commissions were calculated. During his tenure at AAM Ratliff's yearly BSC totals varied from a high of $1,072,212 in 2009 to a low of $197,085 in 2007. Beginning in 2009, Ratliff's production, however, steadily declined to $721,211 in 2010, $556,106 in 2011, $407,456 in 2012, and $317,085 through September 2013.

The thrust of Ratliff's allegations concern the assignment of accounts among salespeople at AAM and the effect such assignments had on his ability to maintain adequate sales numbers, and, in the end, the role such assignments played in his eventual termination.

Ratliff's first set of allegations involve his demotion from a managerial position in 2009. Particularly, he alleges he was removed from his management role without any rationale, and that two Caucasian managers, Boyd Welch and Rob Arnold, were given his responsibilities. Thereafter, according to Ratliff, Welch and Arnold conspired to transfer outside representatives from Ratliff, inhibiting his ability to maintain his production.

Ratliff's next set of allegations involve a series of events that occurred in 2013. At that time, AAM had reorganized its national sales division into two separate teams, AAM1 and AAM2. AAM1 was overseen by John Tuohy, while AAM2 was overseen by Rene Ramirez. Ratliff was assigned to AAM1, a team in which he was the only African American. According to Ratliff, Tuohy abused his authority by assigning lucrative accounts to white employees, and placed no limit on the number of accounts each person in his sales team had.

In March 2013, Tuohy placed Ratliff on a performance improvement plan. The plan stated Ratliff's production was down 20% from Ratliff's own set goal for the year, and he had failed to

meet his sales goals in both January and February of that year. Under the plan, Ratliff identified three things he could do to improve his sales, including reporting to work on time, making 20 prospecting calls per day, and attending bi-weekly development meetings held by Tuohy. By September, however, it appears Ratliff had continuously failed to meet his monthly goals. According to Ratliff, the goals set by Tuohy were impossible to meet because all of the active accounts had been assigned to other employees. As a result of Ratliff's failure to meet those goals, Tuohy approached Ratliff a second time with another improvement plan. The parties disagree as to the tone of that second meeting, but by its end Ratliff's employment at AAM had ended.

During his tenure at AAM, Ratliff received reprimands on at least three occasions. First, in 2008, he received a written warning for being argumentative with a co-worker over the reassignment of a representative who no longer wished to work with Ratliff. Then in 2011, Ratliff received a "final written warning" after having an altercation with a co-worker. In 2009, Ratliff was demoted from his management position for altering the broker-dealer concession—the amount paid by AAM to its clients on a trade—on a trade executed by Ratliff. Although Ratliff lost his managerial responsibilities, it appears his job title, functions, and compensation structure were unaltered after his demotion. It does not appear Ratliff had any other behavioral problems at AAM until his termination.

Ratliff filed his EEOC charge on January 20, 2014; he received his right to sue letter on February 12, 2014, and filed this suit on February 20, 2014 seeking relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq.*, and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.

## II. DISCUSSION

AAM moves for summary judgment on various grounds. With regard to Ratliff's claims based on his demotion in 2009, AAM argues they are barred by the applicable statutes of limitation. As to those claims arising out of Ratliff's termination, AAM takes the position Ratliff cannot make out a prima facie case of discrimination, and in the event he can, he cannot carry his burden to show his termination was pretexual or that his race was a motivating factor in the decision to terminate his employment. AAM also moves to strike various portions of Ratliff's deposition testimony cited in his response to its motion for summary judgment.

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where a movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 325 (1986)). While the court is obliged to resolve factual controversies in the nonmovant's favor, the nonmoving party cannot satisfy its burden by merely establishing "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), by mere conclusory allegations in affidavits, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990), or "by only a scintilla of evidence," *Little*, 37 F.3d at 1075 (internal quotation marks omitted). Rather the nonmovant must identify specific evidence in the record and articulate the precise manner in which evidence supports his or her claim. *Flowers v. Deutsche Bank Nat'l Trust*

4

*Co.*, 614 Fed. App'x 214, 215 (5th Cir. 2015) (per curiam) (citing *Regas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

## B. Analysis

The legal frameworks governing claims under both Title VII and § 1981 are coextensive. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). Where, as here, there is no direct evidence of discriminatory intent, under the Supreme Court's framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) a prima facie case of racial discrimination is established by showing (1) the plaintiff belongs to a protected class; (2) was qualified for the position at issue; (3) was subject to an adverse employment action; and (4) was treated less favorably than other similarly situated employees outside of the plaintiff's class. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a legitimate, non-discriminatory reason for the employment decision. *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012). If the defendant does so, the burden then shifts back to the plaintiff to show the defendant's proffered reason was a pretext for discrimination. *Id.*

A party "must file a charge within either 180 or 300 days of the date of [a discrete retaliatory or discriminatory act] or lose the ability to recover for it." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). An act "occurred on the day that it happened." *Id.* (quotation marks omitted). A demotion is a discrete action "that constitutes a separate and actionable unlawful employment practice." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 280 (5th Cir. 2004) (citing *Morgan*, 536 U.S. at 114). Under § 1981, for those claims that would have not been actionable prior to Congress's 1991 amendment of the statute, 28 U.S.C. § 1658(a)'s general four-year statute of limitation applies, whereas for those claims actionable prior to the 1991 amendment, state law

5

determines the applicable statute of limitation. *Jones v. R.R. Donnelley & Sons, Co.*, 541 U.S. 369, 371–74 (2004). Under these rules, Ratliff has waived any Title VII claims arising prior to April 15, 2013, and any § 1981 claims arising prior to February 20, 2010. Accordingly, Ratliff's claim regarding his demotion in 2009 is time barred, and shall be **DISMISSED**.

With regard to Ratliff's termination claim,[1] as noted above, AAM argues Ratliff cannot demonstrate any adverse employment action on its part, because the transfer of representatives from one salesperson to the next does not affect "job duties, compensation, or benefits" as is required in this Circuit to constitute an adverse employment action. *Pegram*, 361 F.3d at 282. Alternatively, AAM argues Ratliff has failed to identify similarly situated employees outside of his class who were treated more favorably.

Even assuming the reassignment of representatives from one sales person to the next constitutes an adverse employment action under Title VII, *see Pegram*, 361 F.3d at 284, Ratliff has not produced evidence showing similarly situated employees outside of his class were treated more favorably. Ratliff claims that AAM management reduced the number of his accounts over a period of years, beginning in 2009 under two different management structures. Pl.'s Comp., ECF No. 1, at 3. First, in 2009, plaintiff claims that after his loss of managerial responsibilities, Boyd Welch and Rob Arnold, the two Caucasian men who took over his responsibilities, "conspired to systematically remove his accounts from that point forward, devastating his earning and production." *Id.* At deposition, Ratliff stated he lost three accounts while under Welch and Arnold. According to Ratliff, the first account was reassigned after the representative complained to Eric

---

[1] Ratliff also claims his placement on a performance improvement plan constituted an adverse employment action. *See* Pl.'s Compl., ECF No. 1, at 4. "Ultimate employment decisions include acts such as hiring, granting leave, discharging, promoting, and compensating." *Mattern v. Eastman Kodak, Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (qoting *Dollis v. Rubin*, 77 F.3d 777, 782 (5th Cir. 1995)) (internal quotation marks omitted). Placing an employee on a performance improvement plan is not sufficient to constitute an adverse employment action. *See, e.g., Cannon v. St. Paul Fire & Marine Ins. Co.*, No. 3:03CV2911-N, 2010 WL 1107372, at *3 (N.D. Tex. May 6, 2005).

Shipley, one of AAM's managers in Colorado, about Ratliff's demeanor toward her. Pl.'s Resp., ECF No. 22, Ex. 4, Ratliff Dep. at 67–69. It is unclear from the record to whom on Ratliff's team the account was assigned. Subsequently, another account belonging to Ratliff was assigned to Welch by Arnold, apparently without explanation. *Id.* at 110–12. The third account Ratliff identifies as having been removed from his pool, like the first account, also appears to have been the result of the representative's request. *Id.* at 113–119; Def.'s Mot. Summ. J., Ex. 5-C. This account was assigned to Carr Stokes, a Caucasian on Ratliff's team. *Id.* at 120.

Sometime after these assignments took place, AAM restructured its sales teams into AAM1 and AAM2. Ratliff was placed on AAM1 with a new manager, John Tuohy. Under Tuohy, he alleges one account was removed from him and given to Carr Stokes, but has failed to identify the specific account reassigned. Ratliff Dep. at 174–75. He also points to the total number of accounts in his book versus those of other team members to demonstrate unequal treatment. Pl.'s Compl. at 3–4. He further alleges that after the termination of another team member, Tuohy's reassignment of that member's accounts to Welch, rather than equally across the team, was discriminatory in nature. Specifically, plaintiff identifies P.K. Marshall, a Caucasian, as having over 400 accounts, while Ratliff maintained only 80. Pl.'s Resp. at 8. According to Ratliff, Marshall's book of business was also the result of a failure to place departed team members' accounts into a pool. Ratliff Dep. at 220–21. Ratliff also mentions Robby Nolan and Chad Taylor as benefitting from a large number of accounts based on their earnings. *Id.* at 218, 222. Lastly, in his EEOC charge, Ratliff identified Carr Stokes, Jason Richard, Dennis Kennedy, and Jaime Wisecarver as being similarly situated and having received favorable treatment. *Id.* at 223. With regard to Stokes, Ratliff relies on the reassignment of an account while under Welch and Arnold as evidence of favorable treatment. *Id.* at 224. Regarding Jason Richard, Ratliff alleges Richards also had

attendance issues, but, unlike Ratliff, was not disciplined—although Ratliff admits to having no personal knowledge as to whether Richard was disciplined. *Id.* at 225. The same is true for Dennis Kennedy. *Id.* at 226. Regarding Wisecarver, Ratliff alleges he received favorable treatment on UIT accounts and the ability to attend specific conferences due to Wisecarver's relationship with Tuohy. *Id.* Finally, Ratliff relies on AAM2's policy, instituted by its manager, placing a cap on the total number of representatives each salesperson could have. Pl.'s Compl. at 4.

Regarding the transfers that occurred under Welch and Arnold, AAM claims these reassignments are time barred. Def.'s Mot. Summ. J. at 8. Even assuming the reassignments themselves would constitute a "separate and actionable unlawful employment practice," *Pegram*, 361 F.3d at 280, such that the statute of limitations would be applicable, the reassignments, when viewed in a light most favorable to Ratliff, would fall within the continuing violations doctrine. Ratliff alleges, and AAM admits, Ratliff's reduced productivity played a central role in his termination, and due to AAM's compensation structure, Ratliff's productivity was—to one degree or another—directly affected by the accounts assigned to him. The continuing violations doctrine applies only where "the unlawful employment practice manifests itself over time . . . ." *Id.* Accordingly, and in the interest of thoroughness, the Court will address Ratliff's termination claim as also encompassing the account reassignments and assumes without deciding such reassignments would constitute an adverse employment action. However, Ratliff has failed to make a prima facie showing that employees outside his class received more favorable treatment. Indeed, with regard to these transfers, Ratliff identifies only two of the three recipients of the accounts, and the two recipients he does identify received the accounts after the representatives expressed an unwillingness to continue working with Ratliff. Ratliff has adduced no evidence showing anyone else on his team, indeed anyone else at AAM, had a representative complain or request to be

transferred to a different sales person and still retained the representative. Moreover, with regard to the second account transferred, he has failed to show similarly situated employees did not, as a matter of policy, have accounts taken from them. Accordingly, Ratliff has failed to make a prima facie case that the transfers under Welch and Arnold violated Title VII. Likewise, his allegation that while under Tuohy an account was removed from his book and was given to Stokes is insufficient because he has failed to show that as a general matter similarly situated team members did not have representatives transferred from them.

Ratliff's allegations regarding the overall distribution of representatives under Tuohy are equally deficient.[2] First, Ratliff admits that AAM2's policy of placing a cap on the number of representatives each sales person could have was the only instance of such a policy he could recall in the 10 years he had been at AAM. Ratliff Dep. at 164–65. Moreover, he was on AAM1, not AAM2, thereby rendering the wholesale treatment of sales persons on AAM2, under a different supervisor, an improper comparison for these purposes. Second, Ratliff fails to adduce any evidence that those individuals he names as comparators were similarly situated to him. Ratliff produced no evidence regarding Robby Nolan and Chad Taylor other than asserting their sales figures in comparison to his own coupled with their shared participation in AAM1 demonstrate an unequal and unfair distribution of representatives. But by Ratliff's own admission the number of representatives is not necessarily indicative of a sales person's total production. Ratliff Dep. at 173. Thus, even if the Court were to accept Ratliff's inference that Nolan and Taylor had an unfair number of representatives compared to his own based on their sales figures, he has nevertheless failed to demonstrate that Taylor and Nolan were similarly situated specifically with regard to their disciplinary history at AAM, their past sales figures, and the types of trades they structured

---

[2] The Court assumes without deciding that such a distribution scheme would constitute an adverse employment action.

compared to those structured by Ratliff.[3] The same is true for the other AAM employees Ratliff named as comparators. By his own admission, P.K. Marshall had inherited his book of business from the departure of two other AAM sales persons in San Diego, leaving Marshall as the sole AAM representative in that city. Ratliff Dep. at 220. Moreover, AAM adduced unchallenged evidence showing Marshall has, over the years, consistently made sales over $2,000,000 whereas Ratliff had only once, in 2009, topped $1,000,000. Def.'s Mot. Summ. J., Ex. 4, ¶ 39. The same is true of Carr Stokes: AAM produced evidence showing Stokes has never been the subject of a disciplinary action and had never had a single representative complain about him or his communication style whereas Ratliff, at the time in question, had been subject to two disciplinary actions and also had been the subject of two such representative complaints. *Id.* at ¶¶ 33–35. Moreover, AAM presents evidence that Stokes had consistently, produced between $800,000 and $1,000,000 between 2008 and 2013, topping $1,000,000 prior to any transfer of representatives from Ratliff to Stokes. *Id.* at ¶ 35. Ratliff also points to Jaime Wisecarver as a comparator, but Wisecarver proves incomparable as well. Based on Ratliff's deposition testimony, Wisecarver focused on a different product than that of Ratliff, and, more importantly, AAM has produced evidence showing Wisecaver also had no history of complaints or disciplinary actions, unlike Ratliff. *Id.* at ¶ 33. Lastly, although Ratliff names Boyd Welch as a comparator he adduces no evidence—beyond his allegations—upon which the Court could conclude Welch is a proper comparator. Pl.'s Resp. at 8. Accordingly, Ratliff has failed to show any of these employees were similarly situated outside of their presence on AAM1; while it is true Ratliff is not under a burden to show "complete or total identity" between himself and his proffered comparators, *Lee v. Kan. City S. Railway*, 574 F.3d 253, 260 (5th Cir. 2009), the fact remains that he must provide the Court

---

[3] At deposition, Ratliff conceded he primarily focused on bond trades, whereas other employees focused on other areas. Ratliff Dep. at 226–27.

with some basis upon which it may conclude AAM treated similarly situated employees not belonging to Ratliff's class more favorably. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005). Ratliff's comparators, however, are uniformly distinguishable in terms of their production, the products they focused on, their disciplinary history, and their track record with their representatives. These distinctions do not facilitate and do not permit the inference similarly situated employees were treated more favorably than Ratliff.

Finally, Ratliff alleges his termination was racially motivated. However, like his previous allegations, Ratliff fails to show any comparable AAM employee outside of his class who received more favorable treatment. In his complaint, he focuses on the fact that at the time he was placed on his performance improvement plan other Caucasian employees were also behind on their yearly goals by a comparable percentage. Pl.'s Compl. at 4. However, at deposition and in response to this motion, the only specific employee Ratliff points toward to substantiate this claim is P.K. Marshall. As set forth above, AAM adduced evidence unchallenged by Ratliff demonstrating that Marshall's production over the course of years consistently dwarfed Ratliff's. Def.'s Mot. Summ. J., Ex. 4, ¶ 39. Accordingly, he is an improper comparator. Ratliff does not identify by name any other persons whose production declined in a comparable manner; rather, his only proffered evidence consists of unsupported, general allegations made in his complaint and at his deposition. Such allegations are not competent summary judgment evidence. *VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011) ("[A] party cannot defeat summary judgment with conclusory allegations and unsubstantiated assertions."). Ratliff has also failed to point to any AAM employee with a similar disciplinary history to his own.[4] Further, AAM produced

---

[4] Two of Ratliff's proffered comparators, Jason Richard and Dennis Kennedy, are offered to show other employees shared similar instances of absenteeism and tardiness. Ratliff Dep. at 185. Importantly, AAM never disciplined Ratliff for these issues. These comparators are unhelpful.

uncontroverted evidence that the only other individuals on Tuohy's team placed on performance improvement plans along with Ratliff were Chris Gamber, Chris Elbrecht, and Alan Bundy, all of whom are Caucasian. Def.'s Mot. Summ. J. Ex. 3, Tuohy Dec. ¶¶ 13–15. Ratliff's production decline of 20.6% was the highest of the four. *See id.* at ¶¶ 12–15. Although these individuals did not have the same title as Ratliff, they had the same duties and were on the same sales team and, critically, shared Tuohy as a manager. *Id.* at ¶ 16. And, like Ratliff, they were placed on performance improvement plans after they fell short of their production goals in the first quarter of 2013. *Id.* at ¶ 12–16. Like Ratliff, Tuohy terminated Gamber's employment a month after Ratliff's termination, while Elbrecht also resigned that month. Bundy improved his performance until voluntarily departing in February of this year. *Id.* at ¶ 13–15; Def.'s Mot. Summ. J., Ex. 4, ¶ 28–30. Ratliff has failed to show similarly situated employees were treated more favorably with regard to his termination. Accordingly, he has failed to demonstrate a prima facie case of discrimination with regard to his termination.

### III. CONCLUSION

In accordance with the reasoning set forth herein, AAM's motion for summary judgment shall be **GRANTED** and AAM's motion to strike summary judgment evidence shall be **DENIED** as moot in a separate order issued this date.

United States District Judge

DATE: 11/19/15